## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON

**CALVIN GARRETT GRAY,**

      **Petitioner,**

**v.**

                                         **Case No. 2:13-cv-23807**

**DAVID BALLARD, Warden,**
**Mount Olive Correctional Complex,**

      **Respondent.**

### PROPOSED FINDINGS AND RECOMMENDATION

Pending before the court are the petitioner's Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 1) and the respondent's Motion to Dismiss Petition for Writ of Habeas Corpus as Untimely Filed (ECF No. 15). This matter is assigned to the Honorable John T. Copenhaver, Jr., and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

### PROCEDURAL HISTORY

**A.**    **The petitioner's criminal conviction.**

On February 11, 1991, the petitioner was indicted by a Mercer County grand jury on two counts of murder in the first degree arising out of the deaths of Christopher Dillard and Artissa Bennett. The count involving the death of Christopher Dillard was

dismissed before trial.[1]  *State v. Gray*, Case No. 91-F-24).  (ECF No. 15, Ex. 1).  Also, prior to trial, the petitioner's Motion for Change of Venue was granted, and a jury trial was held before the Honorable Charles E. King, Jr., in the Circuit Court of Kanawha County, West Virginia between August 27 and August 30, 1991.  (*Id.*, Ex. 2).  On August 30, 1991, the petitioner was convicted of one count of murder in the first degree concerning Bennett's death.  The jury did not recommend mercy.  By Order entered August 30, 1991, the petitioner was sentenced to life in prison, without the possibility of parole.  (*Id.*, Ex. 3).

**B.      The petitioner's direct appeal.**

On March 6, 1992, the petitioner filed a Petition for Appeal in the Supreme Court of Appeals of West Virginia (the "SCAWV") , which apparently raised claims of error based upon the unitary trial procedure and the issue of mercy, ineffective assistance of trial counsel, and the systematic exclusion of African American citizens from the jury venire.  On June 10, 1992, the SCAWV refused the Petition for Appeal.  (*Id.*, Ex. 4)

**C.      The petitioner's state habeas proceedings.**

On November 22, 1998, the petitioner filed a *pro se* Petition for a Writ of Habeas Corpus in the Circuit Court of Fayette County (presumably because the petitioner was incarcerated at the Mount Olive Correctional Complex, which is located in Fayette County).  (*Id.*, Ex. 5).  On December 8, 1998, the petition was transferred to the Circuit Court of Kanawha County, where it was given Case No. 98-MISC-545 and assigned to the Honorable Charles E. King, Jr.  Although the initial petition is not presently part of

---

[1]  The petitioner's brother, Karl Finney, was convicted of the murder of Christopher Dillard in May of 1991.

the record before this court, it appears that the initial petition filed in 98-MISC-545 included a claim that tainted serology evidence had been presented at the petitioner's trial.

Following a summary dismissal of the petition by Judge King on December 14, 1998, the SCAWV remanded the matter for additional proceedings. (ECF No. 24, Ex. 4A). The docket sheet indicates that an Amended Petition for Writ of Habeas Corpus was filed on or about March 16, 2004. According to an Order dated October 1, 2004, on May 21, 2004, the parties appeared before Judge King for a hearing. The petitioner was represented by counsel, Matthew A. Victor and Michael Cline   (*Id.*, Ex. 6). The Order states that the parties agreed to bifurcate the petitioner's habeas corpus claims to enable the court to address a claim of instructional error concerning an alleged "burden shifting" instruction prior to the petitioner's other grounds for relief. (*Id.*)

At the hearing on May 21, 2004, Judge King instructed the parties to brief the "burden shifting" instruction issue and to submit proposed findings of fact and conclusions of law. (*Id.*) The October 1, 2004 Order found that, although the respondent conceded that the instruction given at trial was erroneous, the error was harmless and invited by the petitioner who requested an instruction on "presumed intent." Accordingly, Judge King found that the petitioner was not entitled to habeas corpus relief on this basis. (*Id.*) The October 1, 2004 Order also scheduled a status hearing on the remainder of the petitioner's claims for habeas corpus relief on November 1, 2004. (*Id.*)

The petitioner, by counsel, had previously filed a Petition for a Writ of Mandamus in the SCAWV on September 1, 2004, seeking a ruling on his instructional error claim.

(*Id.*, Ex. 7).  The SCAWV refused that petition as being moot on October 5, 2004.  (*Id.*)

On December 27, 2004, the petitioner, by counsel, Charles R. Hamilton, filed a Petition for Appeal concerning the denial of his bifurcated instructional error claim. (*Id.*, Ex. 8)  That Petition for Appeal was denied on March 9, 2005.  (*Id.*)

While the petitioner's first habeas corpus petition was still pending, on August 22, 2006, the petitioner filed a second Petition for a Writ of Habeas Corpus pursuant to the SCAWV's decision in *In re Renewed Investigation of State Police Crime Laboratory, Serology Div.*, 633 S.E.2d 762 (W. Va. 2006) (hereinafter "*Zain III*"), which was decided on June 16, 2006.  (ECF No. 15, Ex. 9).  The second petition, *Gray v. McBride*, Case No. 06-MISC-350, asserted that tainted and fraudulent serological evidence used in his case denied him a fair trial.  (*Id.*)  Judge King apparently again summarily dismissed the second habeas petition and, upon appeal, the SCAWV remanded the case to the Circuit Court for further proceedings in compliance with its *Zain III* decision.  (*Id.*, Ex. 10).

On June 6, 2008, the petitioner, by counsel, William M. Lester, filed a Second Amended Petition for Writ of Habeas Corpus in the petitioner's first habeas matter, Case No. 98-MISC-545.  (*Id.*, Ex. 11).  In that petition, the petitioner raised the following grounds for relief:  a burden shifting instruction; withholding exculpatory evidence; improper grand jury procedures; the prosecutor improperly testified to the grand jury; non-disclosure of grand jury minutes; the use of tainted evidence at trial; improper instructions on malice and reasonable doubt; investigating officer planted evidence and used racial slurs; erroneous admission of testimony regarding the petitioner's brother's conviction; systematic exclusion of African Americans from the jury venire; failing to

4

bifurcate the guilt and mercy phases of the trial; the petitioner's absence during a portion of the trial proceedings; ineffective assistance of trial counsel; ineffective assistance of appellate counsel; insufficiency of evidence; and cumulative error. (*Id.*)

Both of the petitioner's habeas matters were subsequently transferred to the Honorable Paul Zakaib, Jr. On December 2, 2010, the petitioner sought a Writ of Prohibition from the SCAWV prohibiting Judge Zakaib from ruling on the petitioner's pending habeas corpus petitions unless and until the petitioner had an opportunity to present expert serological evidence. The Petition for Writ of Prohibition was refused by the SCAWV on September 8, 2011. (*Id.*, Ex. 12).

On April 6, 2012, Judge Zakaib bifurcated the unresolved issues in the petitioner's two habeas corpus petitions, and set a hearing on the serology issues on June 7, 2012, with the remaining issues to be heard on July 27, 2012. (*Id.*, Ex. 14). However, on July 20, 2012, the petitioner moved for a continuance of the evidentiary hearing on the serology issues because of the unavailability of witnesses, including an "indispensable witness," which was the petitioner's serology expert. (*Id.*) Despite having counsel, the petitioner continued to file pro se motions complaining about delays and about his counsel, but insisted upon retaining that attorney. (*Id.*)

On or about November 9, 2012, the petitioner wrote a letter to Rory Perry, the Clerk of the SCAWV, expressing his concerns about substantial delay in the resolution of the petitioner's habeas corpus matters. On November 16, 2012, Judge Zakaib wrote a response letter acknowledging the petitioner's frustration and assuring the petitioner that he was in regular contact with the petitioner's appointed counsel. The letter further states:

> Although the Court is fully aware of the delay in your actions, every effort has been made by the Court to keep the cases moving towards resolution. You earlier expressed a desire to retain your present counsel. Please inform the Court if you now desire to obtain new counsel; otherwise the Court will await response from either you or your counsel regarding whether you still desire to proceed in a "hybrid" manner. After the Court receives this response, the Court will rule on this motion and proceed accordingly with scheduling this matter for final hearing.

(*Id.*, Ex. 15).

On April 2, 2013, the petitioner filed a Petition for a Writ of Mandamus, requesting that Judge Zakaib take action upon the petitioner's two habeas corpus matters. (*Id.*, Ex. 13). The SCAWV issued a Rule to Show Cause and directed Judge Zakaib to respond. On June 7, 2013, Judge Zakaib filed a response letter which recounts his attempts to get the petitioner's habeas matters moving forward. The letter states in pertinent part:

> While these matters have suffered delays, it is incumbent upon Petitioner's counsel to prosecute these cases. This Court has made every attempt to prompt counsel to move the matters to resolution. This has not been an easy task as the Petitioner complains of his counsel's lack of diligence, yet steadfastly maintains he desires to keep him as an attorney. With co-counsel now appointed, the Court will again set this matter for a scheduling conference and expect no further significant delays.

(*Id.*, Ex . 14).

The mandamus petition was denied on August 27, 2013. (*Id.*, Ex. 13; ECF No. 5, Ex. 17) (Case No. 13-0453). As of September 9, 2013, it appears that William Lester and Justin Pritt were appointed to represent the petitioner. (ECF No. 24, Ex. 35).

On August 21, 2014, the petitioner filed a document in this federal court entitled "Introduction of New Evidence to Support Petitioner's Section 2254 Petition" (ECF No. 27), which contains a letter from Judge Zakaib to Chief Justice Robin Jean Davis,

requesting that, in light of his retirement, a senior status judge be appointed to preside over the petitioner's consolidated habeas corpus matters.  According to the Kanawha County Circuit Clerk's Office, the docket sheet in both matters reflects that, on December 29, 2014, the petitioner filed a notice that he does not intend to file any further amended petitions, and it appears that hearings are set in those matters before Special Judge Holliday on May 18-19, 2015.

### D.   Other ancillary matters filed by the petitioner.

In 1993, the petitioner filed two Complaints under 42 U.S.C. § 1983 in this federal court.  Both of these matters were assigned to United States District Judge David A. Faber, and were referred to United States Magistrate Judge Mary S. Feinberg.

The first case, *Gray v. Jones*, Case No. 1:93-cv-00499 (S.D. W. Va.) (Faber, J.), sought only monetary damages stemming from the petitioner's allegation that "excessive force" was used against him in the course of law enforcement executing a court order for the petitioner to have a blood sample taken.  A jury trial commenced on March 22, 1995; however, at the close of the plaintiff's case, Judge Faber directed a verdict in favor of the defendants.  (Case No. 1:93-cv-0049, ECF No. 120).

The second matter, *Gray v. Jones,* Case No. 1:93-cv-00556 (S.D. W. Va.) (Faber, J.), sought the return of certain items that had been seized from the petitioner's home during a search which allegedly exceeded the scope of the search warrant.   On September 21, 1995, Judge Faber dismissed the case based upon a statute of limitations defense.  (Case No. 1:93-cv-00556, ECF No. 92).

The United States Court of Appeals for the Fourth Circuit affirmed Judge Faber's rulings in Case No. 1:93-cv-00556 on April 4, 1996.  *See Gray v. Jones*, 81 F.3d 149,

1996 WL 156297 (4th Cir. 1996) (unpub. per curiam) (Case No. 95-7629).  (ECF No. 25, Ex. 1).  According to the Fourth Circuit docket sheet, the mandate in that case issued on April 26, 1996.  The Fourth Circuit affirmed Judge Faber's rulings in Case No. 1:93-cv-00499 on October 30, 1997.  *See Gray v. Jones*, 129 F.3d 116, 1997 WL 693013 (4th Cir. 1997) (unpub. per curiam) (Case No.  95-6570). (ECF No. 25, Ex. 2).  The plaintiff asserts that he submitted a timely request for rehearing in the appeal of Case No. 95-6570 (ECF No. 24, Ex. 8, ¶ 7) ; however, the Fourth Circuit docket sheet does not reflect any request for rehearing, and indicates that the mandate issued on November 21, 1997.

### E.    The petitioner's section 2254 petition.

On September 27, 2013, the petitioner filed the instant section 2254 petition (ECF No. 1) and related motions to excuse exhaustion of state court remedies due to inordinate delay (ECF Nos. 4 and 5), which have been denied without prejudice.  On March 20, 2014, the undersigned ordered the respondent to file an Answer or other response to the petition, and to also address the petitioner's motions to excuse exhaustion.  (ECF No. 11).

On May 30, 2014, the respondent filed a Response to the Section 2254 Petition (ECF No. 14), a Motion to Dismiss Petition as Untimely Filed, with exhibits (ECF No. 15), and a Memorandum of Law in support thereof (ECF No. 16).  The respondent's Motion to Dismiss Petition as Untimely Filed asserted that the petitioner's petition was not filed within the one-year statute of limitations set forth in 28 U.S.C. § 2244(d)(1), a fact which, if true, would prohibit this court's review of the section 2254 petition, and would obviate the need to address the petitioner's motions to excuse the state court exhaustion requirement.  At the time of the filing of the respondent's Motion to Dismiss,

the petitioner was under an Order of this court to file a "reply" to the section 2254 petition by July 30, 2014, <u>60</u> days later.

However, in light of the respondent's assertion that the petition was untimely, which changed the focus of the proceedings, on or about June 25, 2014, the undersigned determined that an expedited status conference was necessary to discuss these matters with the parties before the petitioner would be required to respond to the respondent's filings.   The undersigned's staff contacted respondent's counsel, Deputy Attorney General Laura J. Young, by telephone, solely for the purpose of scheduling the status conference.   The petitioner was not consulted on the scheduling of the status conference because he is incarcerated and more readily available than respondent's counsel, who represents the State of West Virginia in multiple matters.

During the telephone call between the undersigned's staff and Ms. Young, Ms. Young mentioned that she intended to file an Amended Memorandum of Law in support of the Motion to Dismiss Petition as Untimely Filed to correct an error she believed she had made.   The substance of the respondent's filings and the petitioner's claims for habeas corpus relief were not discussed.   Thus, there was no *ex parte* communication, as expressed by the petitioner on the record during the status conference and again in the petitioner's "Reply & Brief to 'Respondent's Motion to Dismiss' and Brief in Support of Timeliness as Ordered by the Court on July 3, 2014 and Received July 9, 2014" (hereinafter "the petitioner's Response").[2]  (ECF No. 24 at 2-5).

---

[2]    The petitioner's Response further states that, during the status conference, the undersigned made a comment that "it (Court) had to make sure the right law was included."  In fact, what the court stated is that the correct law would be applied (irrespective of what the parties argued).

On June 26, 2014, the respondent filed a Motion for Leave to File Amended or Corrected Memorandum of Law in support of Motion to Dismiss Petition as Untimely Filed (ECF No. 18), which included a proposed Amended or Corrected Memorandum of Law (ECF No. 18, Attach. 1).   The Memorandum of Law addresses the fact that the petitioner's conviction became final prior to the enactment of 28 U.S.C. § 22244(d)(1), as part of the Anti-Terrorism and Effective Death Penalty Act (the "AEDPA"), which imposed a one-year statute of limitations on the filing of habeas corpus petitions under 28 U.S.C. § 2254.   The respondent's proposed Amended or Corrected Memorandum of Law, while still contending that the petitioner's section 2254 petition is untimely, altered the respondent's calculation of the statute of limitations to run from the date of enactment of the AEDPA, which was April 24, 1996.   Thus, the respondent contends that the petitioner's statute of limitations expired on April 24, 1997[3], and that no properly-filed applications for state post-conviction or other collateral review which could toll the statute of limitations were pending at that time.   The merits of this argument will be discussed *infra*.

On June 30, 2014, the petitioner objected in writing to the court's consideration of the respondent's Amended or Corrected Memorandum of Law, claiming that the respondent had more than sufficient time to make all potential arguments by the initial deadline set for his response.  (ECF No. 19).

Over the petitioner's objection, the undersigned granted the respondent's Motion for Leave to File Amended or Corrected Memorandum of Law in support of Motion to

---

[3]     Such calculation is actually more favorable to the petitioner than the respondent's initial calculation, which incorrectly suggested that the statute of limitations expired on September 12, 1993, before the AEDPA statute of limitations had been enacted.

Dismiss Petition as Untimely Filed (ECF No. 18) and will consider the Amended or Corrected Memorandum of Law (now docketed as ECF No. 23) in its analysis of the respondent's Motion to Dismiss.

During the status conference, the parties were permitted to argue their positions concerning the application of 28 U.S.C. §§ 2244(d)(1) and (2) to the petitioner's case, as well as whether the Supreme Court of West Virginia's decision in *In re Investigation of the West Virginia State Police Crime Laboratory, Serology Division*, 633 S.E.2d 762 (W. Va. 2006) ("*Zain III*") has any bearing on the calculation of the statute of limitations in this case. The parties were further advised that the petitioner would have until July 30, 2014 to file a Response to the respondent's Motion to Dismiss Petition as Untimely Filed or to otherwise address his positions on timeliness and exhaustion. The respondent was given until August 14, 2014, to file a reply brief.

On July 29, 2014, the petitioner filed his "Response," which contends that the one-year statute of limitations should be equitably tolled as a result of circumstances surrounding the petitioner's section 1983 proceedings that were pending in this federal court between 1993 and 1997, and/or that the statute of limitations should run anew from the date of the *Zain III* decision. (ECF No. 24). On August 14, 2014, the respondent filed his Reply (ECF No. 25), asserting that there is no valid basis for equitable tolling of the petitioner's case.

On August 19, 2014, the petitioner filed a Motion for Leave to File a Sur-Reply and Sur-Reply (ECF No. 26) with additional exhibits. On August 21, 2014, the petitioner filed additional documentation in support of his section 2254 petition. (ECF No. 27). On February 20, 2015, the undersigned granted the petitioner leave to file his Sur-

11

Reply.  (ECF No. 30).

The arguments of the parties will be addressed in greater detail *infra*.  This matter is now ripe for adjudication.

## ANALYSIS

### A.    The one-year statute of limitations under section 2244(d)(1).

On April 24, 1996, a one-year limitation for filing of federal habeas corpus petitions was enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("the AEDPA").  The AEDPA provides, in part, that:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or law of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).  Section 2244(d)(2) further provides:

> The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(2).

12

On May 30, 2014, the respondent filed a Motion to Dismiss Petition for Writ of Habeas Corpus as Untimely Filed (ECF No. 15) and a Memorandum of Law in support thereof (ECF No. 16).  As noted above, on July 8, 2014, the respondent filed an Amended or Corrected Memorandum of Law (ECF No. 23), which the undersigned granted leave to consider.  Thus, the Amended or Corrected Memorandum of Law (ECF No. 23) will be the document which the court will consider in addressing the respondent's initial arguments made for dismissal on the basis of untimeliness.

The respondent asserts that, under 28 U.S.C. § 2244(d)(1)(A), the petitioner's section 2254 petition was not timely filed.  (ECF No. 23 at 7-9).  It appears that the petitioner does not disagree that his federal petition was not timely filed under the parameters set forth in 28 U.S.C. § 2244(d)(1)(A).  However, the petitioner asserts that his federal petition should be considered to have been timely filed, either under 28 U.S.C. § 2244(d)(1)(D), due to a later date upon which the factual predicate of one of his claims was discovered, or by the application of equitable tolling based upon alleged "extraordinary circumstances."  (ECF No. 24 at 6-14).  The undersigned will first address the timeliness analysis under section 2244(d)(1)(A), and then turn to the petitioner's other arguments concerning timeliness.

**B.  The petitioner's petition is untimely under section 2244(d)(1)(A).**

The petitioner's direct appeal was refused by the SCAWV on June 10, 1992.  The petitioner then had 90 days, or until September 11, 1992, to file a Petition for a Writ of Certiorari in the United States Supreme Court, which he did not pursue.  *Harris v. Hutchinson*, 209 F.3d 325, 328 (4th Cir. 2000) (Time for seeking direct review concludes either when the period for filing a petition for a writ of certiorari expires or

13

when such writ is denied by the United States Supreme Court).  Thus, the petitioner's criminal judgment became final on or about September 11, 1992.

The United States Court of Appeals for the Fourth Circuit has held that, "in the case of a habeas challenge to a state conviction that became final prior to the enactment of the AEDPA, a habeas petitioner is entitled to a one-year grace period from the effective date of the Act, April 24, 1996, in which to file a federal habeas petition." *Crawley v. Catoe*, 257 F.3d 395, 398 (4th Cir. 2001) (citing *Brown v. Angelone*, 150 F.3d 370, 375 (4th Cir. 1988)).  Thus, barring any tolling event, the petitioner had until April 24, 1997 to file a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.

The petitioner did not file his first state habeas corpus petition until November 22, 1998.  Thus, the petitioner did not have any application for State post-conviction or other collateral review with respect to his murder conviction pending on April 24, 1997. Therefore, no statutory tolling event occurred, and the petitioner's section 2254 petition, which was not filed until September 27, 2013, is untimely under 28 U.S.C. § 2244(d)(1)(A).  The undersigned will address the applicability of section 2244(d)(1)(D) *infra.*

### C.    Equitable tolling of the statute of limitations based upon the petitioner's section 1983 cases is not warranted.

In *Holland v. Florida*, 560 U.S. 631, 643 (2010), the Supreme Court held that the statute of limitations in section 2244(d) is subject to equitable tolling in appropriate cases.  The *Holland* Court stated that a petitioner is entitled to equitable tolling only if he shows "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."  *Id. (quoting*

*Price v. DiGuglielmo*, 544 U.S. 408, 418 (2005)); *see also Harris v. Hutchinson*, 209 F.3d at 329-330.   As to when equitable tolling should apply, the Fourth Circuit has stated:

> We believe, therefore, that any resort to equity must be reserved for those rare instances where - due to circumstances external to the party's own conduct - it would be unconscionable to enforce the limitation period against the party and gross injustice would result.

*Harris*, 209 F.3d at 330.   The Court opined that equitable tolling should apply in "two generally distinct kinds of situations:" (1) where a plaintiff/petitioner is prevented from asserting his claim by some kind of wrongful conduct on the part of the defendant/respondent; and (2) where extraordinary circumstances beyond the plaintiff/petitioner's control made it impossible to file the claims on time.   *Id.*

The Supreme Court has further held that "a garden variety claim of excusable neglect" is insufficient to rise to the level of extraordinary circumstances necessary to justify equitable tolling.   *See Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990)). The Fourth Circuit has reserved equitable tolling for "'those rare instances where - due to circumstances external to the party's own conduct - it would be unconscionable to enforce the limitation period against the party and gross injustice would result.'"   *Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003) (en banc) (quoting *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000)); *Green v. Johnson*, 515 F.3d 290, 304 (4th Cir. 2008).

The petitioner contends that the statute of limitations for filing his section 2254 petition should be equitably tolled on the basis that he relied upon a statement allegedly made by United States Magistrate Judge Mary S. Feinberg, "(in approximately 1995) around the time he was in her Court for the conference with Mercer County Prosecutor

Mr. Smith . . . that he 'would be able to file his State Habeas after these cases [meaning his section 1983 cases] were complete." (ECF No. 24 at 10 and Ex. 8). The petitioner further contends that the United States Supreme Court decided *Heck v. Humphrey*, 512 U.S. 477 (1994) while his section 1983 cases were pending and that, under *Heck*, the District Court and/or the United States Court of Appeals for the Fourth Circuit were mandated to make a finding on the record of whether the petitioner's section 1983 claims could have "invalidated" his conviction or sentence. The petitioner contends that the fact that the federal courts never made such a determination should be considered, along with his reliance upon Magistrate Judge Feinberg's statement as "extraordinary circumstances" that would warrant equitable tolling of the AEDPA statute of limitations. As explained in his Response:

> Petitioner avers that the "extraordinary-exceptional" fact here is the fact that he had filed his two (2) § 1983 civil actions pre-*Heck, supra*. Petitioner had only requested monetary damages and was seeking to gather further information, evidence and a deposition in order to use for further state court proceedings. The United States District Court Magistrate Judge Mary S. Feinberg, after *Heck* was decided, told Petitioner that he would be able to file his habeas after everything was concluded. There was never any determination made on the record concerning whether Petitioner was attacking the length of his confinement or the length of his sentence. Further, Petitioner appealed to the Fourth Circuit Court of Appeals (both actions). The Fourth Circuit Court of Appeals held Petitioner's appeal in abeyance (See Exhibit-7), and finally made a ruling in 1997. See Exhibit-7. They, too, never made any "determination on the record," and this being well after *Heck* was decided.

> * * *

> Petitioner avers that his reliance on the United States District Court Magistrate Judge, and the undisputed fact that neither the United States District Court nor the Fourth Circuit Court of Appeals, managed to follow the mandate of *Heck*, to petitioner's case is "extraordinary and exceptional," and as such, Petitioner should be accorded "equitable tolling from the date of the time that the Fourth Circuit Court of Appeals'

16

mandate became final.

(ECF No. 24 at 12-13).

On August 14, 2014, the respondent filed a Reply brief which contends that the petitioner does not qualify for equitable tolling of the statute of limitations for his section 2254 petition on the basis of his two section 1983 cases.  (ECF No. 25 at 1-5).  The Reply states in pertinent part:

> Here, the petitioner contends that the defense of equitable tolling applies to his failure to timely file his Petition.  He specifically argues that these excuses amount to an "extraordinary circumstance," justifying his untimeliness because he was allegedly informed by the U.S. Magistrate that his time frame to file his § 2254 habeas petition in Federal court would not begin to toll [sic; run?] until the Fourth Circuit issued a final decision on his civil actions.  First, there is no evidence in the record to substantiate that such a representation was ever made.  Second, even if the Magistrate did make such a representation, it would not constitute an "extraordinary circumstance," since even if he was justified in relying on the Magistrate's alleged representation that the statute of limitations for his § 2254 habeas claim would be tolled until the final disposition of his § 1983 claims, he was still untimely.  The Fourth Circuit denied his appeal in Civil Action No. 93-0556 ("0556") on April 4, 1996.  *Gray v. Jones*, 1996 WL 156297 (4th Cir. 1996) (unpub. per curiam) attached hereto as Resp't's Ex. 1.  The Fourth Circuit denied the appeal in Civil Action 93-0499 on October 30, 1997.  See *Gray v. Jones*, 1997 WL 693013 (4th Cir. 1997) (unpub. per curiam) attached hereto as Resp't's Ex. 2.  If the Petitioner had actually relied on the alleged representation of the Magistrate he would have filed his state habeas by October 30, 1998, but he did not file until November 22, 1998.  So even given the benefit of the doubt, he failed to show any exercise of "reasonable diligence" to timely file his habeas petition.

(ECF No. 25 at 2-3).

The respondent's Reply further contends that the *Heck* decision has "no application to the petitioner's § 1983 claims because those claims had absolutely no impact on his criminal conviction, and thus, were properly analyzed and disposed of as § 1983 claims."  (*Id.* at 3).  The respondent notes that in Case No. 93-0499, the petitioner

sought monetary damages stemming from his allegation that law enforcement officers allegedly used excessive force while executing a court order to have the petitioner's blood withdrawn.  Judgment as a matter of law was ultimately entered for all of the defendants, upon a finding that, if any injury was sustained by the petitioner, it was *de minimus*.  The Reply further states:

> It is clear that the claims surrounding the § 1983 claims in 0499 had no bearing at all on the Petitioner's criminal conviction, and therefore, no grounds to argue it should have been [a] § 2254 habeas claim pursuant to *Heck*.  As the petitioner himself points out, his blood was drawn per court order, and his § 1983 demanded money damages for excessive force allegedly used to obtain the blood sample, and not whether the excessive force had a direct impact of the admissibility of evidence, or otherwise impacted his conviction.

(*Id.* at 4).

The respondent further contends that *Heck* is equally inapplicable to the petitioner's second § 1983 case, 93-0556, which sought the return of certain items that were seized from his house, during what the petitioner contended was an illegal search.  These items were not introduced at trial and, thus, had no bearing on his conviction or sentence.  Thus, the holding in *Heck* really had no direct bearing on the petitioner's cases.

The undersigned has reviewed the docket sheets for both of the plaintiff's section 1983 actions.  In Case No. 1:13-cv-00556 (the search warrant case), Magistrate Judge Feinberg conducted a status and scheduling conference on the record on May 4, 1995.  (Case No. 1:93-cv-00556, ECF No. 52).  The undersigned has obtained the tape recording from that hearing and the undersigned's staff has listened to the tape and determined that there is nothing in the record that would demonstrate that Magistrate

18

Judge Feinberg had any communication with the plaintiff concerning the timing of filing a habeas corpus petition.  Furthermore, there is nothing on the docket of Case No. 1:93-cv-499 to reflect that any court hearings were held in that case at all (except for depositions which were permitted by the court to be recorded using the Court's recording equipment), and those proceedings took place on February 22, 1994.

The petitioner bears the burden of demonstrating evidence to support a finding that extraordinary circumstances prohibited him from timely filing his federal habeas petition.  He has produced nothing other than his own affidavit to support that such a representation was made by Magistrate Judge Feinberg.  The undersigned proposes that the presiding District Judge **FIND** that the petitioner has not offered sufficient evidence of any statements made by Magistrate Judge Feinberg that would serve as extraordinary circumstances to support a finding that equitable tolling of the statute of limitations is warranted.

The petitioner has also proffered a completely inaccurate explanation of the holding in *Heck v. Humphrey*, 512 U.S. 477 (1994).  In *Heck*, the Supreme Court held that, in an action for damages brought against state officials under 42 U.S.C. § 1983 that implicates or challenges the validity of a criminal conviction, such claims must first be addressed, and the conviction called into question or invalidated, before the plaintiff may seek monetary damages for his claim.  There is nothing in the *Heck* opinion that "mandates" that a federal court reviewing a section 1983 case must affirmatively state whether or not the claim presented could invalidate the plaintiff's underlying criminal conviction.  In fact, the *Heck* decision really has no bearing on the status of the actual claim that calls the conviction into question; rather, it merely held that the plaintiff in

the section 1983 matter is not entitled to monetary damages, unless and until he can demonstrate that the criminal conviction or sentence has been reversed on appeal, expunged by executive order, or declared invalid by a state or federal court.  In a case which does not in any way call into question the validity of a section 1983 plaintiff's conviction, there is no "mandate" that the court make a specific finding that *Heck* does not apply.

Thus, the undersigned proposes that the presiding District Judge **FIND** that the petitioner's claims raised in his section 1983 cases did not call into question his criminal conviction or sentence and, thus, there is no basis for equitable tolling of the statute of limitations for petitioner's section 2254 petition based upon *Heck v. Humphrey*, or the petitioner's reliance thereon.

Furthermore, it is clear that petitioner's pro se status and/or ignorance of the law are not "extraordinary circumstances" sufficient to equitably toll the statute of limitations.  *See, e.g., United States v. Sosa,* 364 F.3d 507, 512 (4th Cir. 2004) (pro se status and ignorance of the law does not justify equitable tolling; *Barrow v. New Orleans S.S. Ass'n*, 932 F.2d 473, 478 (5th Cir. 1991) (refusing to apply equitable tolling where the delay in filing was the result of a plaintiff's unfamiliarity with the legal process or his lack of legal representation); *United States v. Flores*, 981 F.2d 231, 236 (5th Cir. 1993) (pro se status, illiteracy, deafness, and lack of legal training are not external factors sufficient to excuse or extend limitations period); *Fisher v. Johnson*, 174 F.3d 710, 714 (5th Cir. 1999) ("ignorance of the law, even for an incarcerated pro se petitioner, generally does not excuse prompt filing").  Thus, regardless of what Magistrate Judge Feinberg told the petitioner, or how the federal courts handled the petitioner's

20

immaterial section 1983 claims, when the AEDPA was enacted on April 24, 1996, the petitioner had a duty to abide by it.

Despite the petitioner's assertions that he relied upon Magistrate Judge Feinberg's alleged statements and the failure of the federal courts to make a determination on the record concerning whether his section 1983 claims called into question his criminal conviction or sentence, the undersigned proposes that the presiding District Judge **FIND** that these are not "extraordinary circumstances" that would qualify for equitable tolling of the statute of limitations on the petitioner's section 2254 petition.

> **D.    The petitioner is not entitled to application of § 2244(d)(1)(D) based upon the *Zain III* decision and the serology evidence.**

The petitioner further asserts that the discovery by the plaintiff of his blood type in a medical record on or about February 28, 1998, which differed from the blood type attributed to the petitioner by Trooper H.B. Myers during his trial and/or the SCAWV's decision in *Zain III* on June 16, 2006, qualify as "newly discovered evidence" permitting the running of the one-year statute of limitations on his section 2254 petition from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence" under 28 U.S.C. § 2244(d)(1)(D). (ECF No. 24 at 13-14).

The petitioner asserts that false evidence was presented at his trial by Trooper H.B. Myers ("Myers").   It is a violation of due process for the State to convict a defendant based upon false evidence.   *Napue v. Illinois*, 360 U.S. 264 (1959). Furthermore, the State is responsible for false testimony even if the prosecutor is

unaware of the falsity. *Giglio v. United States*, 405 U.S. 150 (1972); *Miller v. Pate*, 386 U.S. 1 (1967). However, a conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict. A new trial will only be granted if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Napue*, 360 U.S. at 271; *Giglio*, 405 U.S. at 154.

Ultimately, then, the petitioner must establish that false evidence was presented to the jury; that, with due diligence, the falseness of such evidence could not have been discovered prior to trial; and that the admission of the false evidence had a material effect on the jury verdict.

The petitioner's case involved the stabbing deaths of Christopher Dillard ("Dillard") and Artissa Bennett ("Bennett") on or about November 12 or 13, 1990. The bodies of both victims were found at separate times on a rural hillside known as "Tank Hill" in Mercer County, West Virginia. The state medical examiner testified that Dillard has "six incised [from a sharp object] wounds, three of which were stab wounds." (ECF No. 25, Ex. 5 at 544-545). The medical examiner testified that several of his wounds were post-mortem in origin. (*Id.* at 541). The state medical examiner further testified that Bennett had a total of 50 stab wounds, clustered in her chest and torso. (*Id.* at 538-540).

The trial testimony established that the petitioner brought Dillard and Bennett to his house in Bluefield, Mercer County, West Virginia, where he was living with his elderly, invalid mother, his half-brother, Karl Finney ("Finney"), a niece, Obithia Cunningham ("Obithia"), and a nephew, Omega Rosire ("Omega").

22

According to the evidence presented at trial, an argument erupted between the petitioner and Dillard in the upstairs of the house, which resulted in a physical altercation that moved into the downstairs living room, where Finney, Bennett, Obithia, Omega and the petitioner's mother were gathered. The primary State witnesses were Omega and Obithia, who witnessed much of the altercation in the living room. The trial judge found both children to be competent witnesses, but permitted the defense wide latitude on questioning their credibility on cross-examination. (ECF No. 25, Ex. 5 at 217, 318). The petitioner's elderly mother was unable to communicate and offered no evidence whatsoever.

According to both Omega and Obithia, when the fight moved into the living room, Finney was drunk and asleep on the couch. The petitioner was struggling with Dillard and asked Obithia to go look for some wire or something for him to tie Dillard up with, and he asked Omega to go look for a sock, which was subsequently put in Bennett's mouth.[4] During this time, Bennett was allegedly yelling at the petitioner, asking him if he wanted some money and begging him not to hurt Dillard. (*Id.* at 324). At some point while Dillard and the petitioner were struggling on the floor, Finney woke up and got involved. According to Omega, Bennett twice attempted to jump up from where she was seated, and Finney shoved her on the couch and she hit her head. (ECF No. 25, Ex. 5 at 262).

According to Omega and Obithia, while Finney was struggling with Dillard, the petitioner took Bennett out and put her in the back seat of his van. Omega was outside by the van as well, and when he looked back through the window, he saw Finney's hand

---

[4]   Thus, both children were out of the living room for a brief period of time during the altercation.

go up and down (in a stabbing motion).  (*Id.* at 227, 262, 267).  Obithia testified that, while the petitioner and Omega were outside with Bennett, Finney grabbed a knife from under a couch and stabbed Dillard in his back.  (*Id.* at 340, 361).  The petitioner returned inside and assisted Finney in dragging Dillard to the front seat of the van. Because Dillard was resisting, Finney told Omega to go get a hammer, and then Finney hit Dillard in the head with the hammer and gave it to Omega and told him "if he moves, hit him in his head."  (*Id.* at 227).  Omega then left in the van with the petitioner and the victims, while Obithia stayed at the house with Finney and her grandmother.

Omega further testified that, while they were driving, Dillard was still conscious and said, "Calvin don't kill me," and the petitioner said, "I am not going to kill you, I am going to take you to the hospital."  (*Id.* at 228).  However, as they were driving around, the petitioner's van got stuck up on a hill and the resident of a nearby home came out and helped them free the van.  (*Id.* at 229).  Then, the petitioner drove up on to Tank Hill and proceeded to drag Dillard out of the van through the side door and took him some distance from the van.  Omega said he saw the petitioner pick up a rock and he dropped it on Dillard.  (*Id.* at 230).

Omega further testified that the petitioner came back and took Bennett from the vehicle, and walked her down a dirt hill.  Omega said he couldn't see them, but he heard rumbling leaves and then heard Bennett scream.  (*Id.* at 230).  He said he could not remember how long she screamed or if the screams stopped suddenly, but he remembered seeing Bennett's coat fly up in the air.  (*Id.* at 231).  The petitioner then returned to the van alone, and said "Let those MF'ers walk home."  (*Id.*)

Omega testified that they returned to their house and the petitioner told Finney that he took Dillard and Bennett to the hospital.  (*Id.*)  The following day, the petitioner told Omega and Obithia that, if anyone asked them, to say that they dropped Dillard and Bennett off at their apartment door.  (*Id.* at 232).

The petitioner was the sole defense witness at trial.  He testified that, in the course of the fight, and while the two children were out of the room, Finney pulled a knife out from under a couch and stabbed Dillard at least once (i*d.* at 638), and although he could not confirm that he actually saw Finney stab Bennett, he said that Finney was swinging the knife around wildly and that Finney jumped on top of Bennett, who was "screaming and saying something like don't hurt him, don't kill him, don't something." (*Id.* at 639-640).  The petitioner further described this scene as follows:

> And Karl just -- he is like a beserk, wild man and I am trying to stop him.  And Karl is swinging, and he is standing there and -- not so much standing, but -- Karl doesn't stand erect because of his back for the most part.  He is always tilted back or, if he is drunk, he is hunched over, for the most part.  He had her down.  And Karl, was -- I can't tell you the amount of time involved in none of this because to me it might have seemed like hours, but it probably wasn't hours or anything of that sort.  He is sticking and stabbing, and clothes and stuff are flying.  I didn't know what was going on.  I tried to hurry and up and finish.  I am screaming and hollering.  I don't know what Karl did with that knife.

(*Id.* at 640).  Thus, the petitioner suggests that Finney stabbed Bennett during this altercation.  (*Id.* at 679).

The petitioner further testified that, once he got Dillard tied up, he was focused on getting them out of the house and away from Finney.  Thus, he said he put Bennett's coat over her and, although she was barely walking, he took her out and put her in the back seat of the van, which was covered in plastic, from where his mother would lay

down.  He said he did this "because of the blood and stuff."  (*Id.* at 641-642).  Then, he went back into the house and he and Finney moved Dillard to the van.  He said Dillard was stumbling and struggling, and Finney told Omega to go get a hammer, which Finney used to hit Dillard in the head with.  (*Id.* at 643).

The petitioner further testified that, once they got to Tank Hill, he went and got Bennett out of the van first.  He said she wasn't making any noises.  He further stated that, as he took her away from the van, he dropped her face down, because she was heavy, and he hollered or made a "vocal noise."  (*Id.* at 649-650).  He further stated that when he went to pick her up, her coat was laying there, and he threw it.  He said there were leaves everywhere and he just started "throwing leaves and everything else."  (*Id.* at 650).  Then, he says he went back and got Dillard, who was so heavy, he had to drag him, and then he "just tossed him over the hill."  (*Id.* at 651).  The petitioner testified that both victims were dead at that time.  (*Id.*)

The petitioner further testified that, when he got home, he took a bath and collected both his and Finney's clothing and placed them in his bedroom.  The petitioner contends that State's Exhibit 12A, a pair of pants attributed to be the pants that the petitioner was wearing that night, which contain blood markers consistent with only Bennett's blood, are actually "sweatpants" that Finney was wearing that night, and that they would not fit the petitioner.  (*Id.* at 691-693).  The petitioner further testified that there was a lot of Bennett's blood in the van that night, but he took the vehicle to a car wash the following day and "was trying my best to go to town."  (*Id.* at 657).  The petitioner further testified that "there was blood in the living room, but it had gotten mixed in with clothing that was there" and he didn't know if Finney had attempted to

clean, but the petitioner said he put out a bucket with Clorox and Pinesol and other cleaners out to try to mix to get rid of stains. (*Id.* at 657-658).

Although there is some discrepancy in the trial testimony as to when and where Dillard and Bennett were stabbed or otherwise injured, the testimony is consistent that the petitioner took Bennett, who was conscious at the time, out to his van and placed her in the back seat. The trial testimony is also consistent that the petitioner and Finney dragged and forced Dillard into the front passenger seat of the van. The petitioner then left with the victims and Omega in the van. The petitioner testified that he planned to take the victims to the hospital, but got scared and instead drove them around and wound up at Tank Hill. The petitioner admitted that he dumped both Dillard and Bennett's bodies on Tank Hill and then returned home in the van with Omega.

At trial, Myers testified about the serology evidence collected from the scene on Tank Hill where Dillard and Bennett's bodies were located, and also that collected from the petitioner's van, and clothing found at the petitioner's house. Myers testified that known blood samples were taken from the victims, Finney, and the petitioner, for comparison to the blood found on these various items of evidence. By the time of the petitioner's trial, Finney, who had been separately tried, had been convicted of the murder of Dillard.

Myers' testimony was very brief. He testified about the procedures for determining whether human blood is present on an item of evidence and that they conduct testing to determine ABO blood types and certain red blood cell enzymes. (ECF No. 25, Ex. 5 at 556-557). Myers testified that, in this case, blood found on the passenger side front door of the petitioner's van was consistent with genetic markers of

27

the petitioner's and Dillard's blood samples.  (*Id.* at 559).  According to Myers, no other blood evidence collected matched the petitioner's blood type.   His specific relevant testimony states as follows:

> Q. The two samples of blood that you obtained from the Ford van, were you able to determine whether, in fact, they were blood or not?
>
> A. Yes, sir.
>
> Q. And, were they?
>
> A. Yes, sir, they were.
>
> Q. And could you determine whose blood they were?
>
> A. Yes, sir.  One sample from the front passenger door of the van was consistent with Mr. Dillard and was not consistent with Ms. Bennett, Mr. Gray or Mr. Finney.   The second blood sample found on the side door, I did not identify as many of the genetic markers on that sample, and so the markers identified from it were consistent with Mr. Gray and Mr. Dillard and were not consistent with Ms. Bennett or Mr. Finney.

(*Id.* at 559).

The remainder of Myers' testimony confirmed that blood characteristics consistent with Bennett's blood were found on leaves at the scene where the bodies were located (State's Exhibit 10), on Bennett's coat (State's Exhibit 3) and a scarf (State's Exhibit 14), which were found at that same location, and on one pair of pants found in the petitioner's bedroom (State's Exhibit 12A).  (*Id.* at 557-560).  On cross-examination, Myers stated that he did not identify blood on another pair of pants (State's Exhibit 12B) or on a black shirt (State's Exhibit 12C), which were also collected from the petitioner's bedroom.   Myers also confirmed that he "cannot test every single piece of blood or particles of blood, so [he] takes a representative sample and tests that one sample."  (*Id.*

at 562).  Myers further stated that he was unable to identify blood on a couch cushion cover that was received at the lab on December 5, 1991.  (*Id.* at 563).

The petitioner's serology-based claims arise out of his contention that Myers' written report stated that the petitioner's blood type was B+; however, on February 28, 1998, the petitioner underwent a medical procedure at Montgomery General Hospital and a medical record from that date lists his blood type at A-.  Thus, the petitioner contends that Myers report contained false evidence, which was presented at his trial.[5] The petitioner raised this claim in his first state habeas petition.

In that petition, the petitioner asserted that, because Myers testified that the blood found on the passenger door of the van was consistent with the blood types of both the petitioner and Dillard when, in fact, it could only be consistent with Dillard, who was a blood type B, "the only presumption from this testimony the jury could have gotten was that this petitioner was in some way involved with the alleged crimes, which is patently false."  (ECF No. 24. Ex. 4A at 6).

On June 16, 2006, the SCAWV issued its opinion *in In re: Renewed Investigation of the State Police Crime Laboratory, Serology Division*, 633 S.E.2d 762 (W. Va. 2006) ("*Zain III*").  In that decision, the Court addressed whether serologists in the State Police Crime Lab, other than Fred Zain, falsified evidence in criminal prosecutions.[6]  In the course of this third investigation, Mark Stolorow, Executive Director of Orchid

---

[5]  The undersigned notes that the jury was never told the blood types or any other specific information about the genetic markers or other serology test results; nor was Myers' report admitted as evidence.

[6]  After presuming all of the serology evidence tested by and testified about by Fred Zain was false, as addressed in *Zain I*, the court then determined that there was no basis to similarly hold concerning the serology work done by other serologists in the West Virginia State Police Crime Lab in *Zain II*.  In *Zain III*, the SCAWV revisited that issue and issued the holding discussed *infra*.

Cellmark and Ronald Linhart, an inspector with the ASCLD/LAB, authored a joint report, filed on December 2, 2004, concerning the serology testing that had occurred in eight selected cases, one of which was the petitioner's case (hereinafter "the Stolorow/Linhart report"). *Id.* at 765. The Stolorow/Linhart report concluded:

> The errors found by this investigation were frequent, recurring and multifaceted, spanning the spectrum of examiners. However, it must be stressed that in only one instance does it appear that erroneous procedures, documentation, reporting or testimony led to a false, but non-probative, association between a defendant and the biological evidence (State v. Gray and Finney)[7] . . . The authors of this report do not ascribe any particular motive, intent or design to the scientists in regard to the errors made . . .
>
> Finally, there is a significant qualitative difference between the errors discovered during this investigative review and the shocking and egregious misconduct documented in *Zain I.* The intentional and willful malfeasance and reckless disregard of both truth and good scientific practice exhibited by Fred Zain were not found to exist in these cases among the remaining serologists in the laboratory.

*Id.* at 766. The report described the work product of the other serologists as "potentially unreliable." *Id.*

Following receipt of a report from the Honorable Thomas A. Bedell, who succeeded Judge Holliday as special judge assigned to these matters, the SCAWV issued its decision, which held:

> After careful review of the Stolorow/Linhart findings, the special judge's report, and the briefs of the prisoners and the State, this Court concludes that there is insufficient evidence of intentional misconduct to justify invalidating the work of serologists other than Zain.

*Id.* at 767. However:

---

[7]   This reference to "a false, but non-probative, association between a defendant and the biological evidence" appears to concern Myers' findings of blood evidence on a pillowcase, which Myers' report found to be consistent with Karl Finney's blood characteristics. However, the PGM enzyme result on the raw data sheet and case worksheet eliminates Finney, as well as Gray and the two victims, as the depositor of that blood. Accordingly, that evidence is also non-probative of the petitioner's guilt.

> because of the significant number, frequency, and types of errors which Stolorow discovered in the work of the Crime Lab serologists, this Court finds it necessary to enact additional safeguards to ensure that prisoners against whom serologists offered evidence receive a thorough, timely and full review of their challenges to the serology evidence.

*Id.* at 769.  Thus, the SCAWV set up a special habeas corpus procedure to be utilized by those prisoners against whom serologists, other than Zain, had offered evidence.

Accordingly, in habeas corpus cases involving serologists other than Zain, "a prisoner who challenges his or her conviction must prove that the serologist offered false evidence in his or her prosecution."  Also the prisoner must satisfy the following standards indicating that a new trial is warranted:  (1) The evidence must appear to have been discovered since trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained; (2) It must appear from facts stated in his affidavit that the defendant was diligent in discovering the new evidence, and that it could not have been discovered with due diligence before the trial; (3) Such evidence must be new and material, and not merely cumulative; (4) The evidence must be such that it ought to produce an opposite result at a new trial on the merits; and (5) A new trial will generally be refused if the sole object of the new evidence is to discredit or impeach an opposing witness.  *Id.* at 769 (citing *State v. Frazier*, 253 S.E.2d 534 (W. Va. 1979)).

Concerning the special procedures, the SCAWV further held that a prisoner against whom a serologist other than Zain offered evidence is to be granted a full habeas corpus hearing on the issue of the serology evidence, with counsel appointed to represent him or her.  The Court further held that the Circuit Courts must review the

31

serology evidence "with searching and painstaking scrutiny" and must draft "a comprehensive order" which includes "detailed findings as to the truth or falsity of the serology evidence."   If the Circuit Court finds that the evidence was false, then the Circuit Court must determine whether the prisoner has shown the necessity of a new trial based on the five *Frazier* factors.   *Id.*   Finally, the SCAWV held that such proceedings must be conducted in as reasonably timely manner as possible, and that such proceedings are not subject to the res judicata limitations normally applied to state habeas corpus proceedings.  *Id.*  The SCAWV further specifically held:

> In order to guarantee that the serology evidence offered in each prisoner's prosecution will be subject to searching and painstaking scrutiny, this Court now holds that a prisoner who was convicted between 1979 and 1999 [footnote omitted] and against whom a West Virginia State Police Crime Laboratory serologist, other than Fred Zain, offered evidence may bring a petition for a writ of habeas corpus based on the serology evidence despite the fact that the prisoner brought a prior habeas corpus challenge to the same serology evidence and the challenge was finally adjudicated.

Id. at 770.  This is the process that must occur in the petitioner's *Zain III* habeas proceeding, Case No. 06-MISC-350, which is still pending in the Circuit Court of Kanawha County.

The Stolorow/Linhart report questions the methodology and lack of supporting evidence and documentation in the cases they reviewed.   The petitioner has filed excerpts from this report that are applicable to his case.  (ECF No. 5, Ex. 19).  The report lists the test results on the known blood samples of the victims, the petitioner, and Karl Finney, and 15 items of evidence (although the report refers to 19 items) from the petitioner's case.  (*Id.* at 10-16).  The report contains a chart comparing the results that were placed on raw data sheets (allegedly at the time of testing), those placed on the

serology worksheet (a summary of all of the testing completed in a certain case), and from the laboratory report (which is produced to the State and then to the defendant, and which serves as the basis for the serologists' testimony, even though the report itself is generally not admitted as evidence).

The report indicates that the known blood sample of the petitioner was listed as "B;" that of Finney was listed as "A;" that of Dillard was listed as "B;" and that of Bennett was listed as "O." (*Id.* at 10-11). Thus, the petitioner's blood type is different than that subsequently discovered during his medical procedure in 1998. However, the undersigned does not view the petitioner's blood type as being material to the ultimate issue in this case, which is, whether the petitioner stabbed and killed Artissa Bennett on Tank Hill, or whether she had already been stabbed by Finney at the house.

All evidence that contained markers that were consistent with Bennett's blood was found on Tank Hill, except for a pair of pants (State's Exhibit 12A), which were located in the petitioner's bedroom. The investigating officer, Detective Jones, testified that, when Bennett's body was found, "there was blood all over her, her clothing, and there were puncture wounds all through her chest, her back. There was a wound going right through under her chin . . . There [were] wounds on her hands or, you know, in between her fingers, or right there on her fingers. That is what we constituted as defensive wounds." (ECF No. 25, Ex. 5 at 468-469).

The petitioner's Response brief asserts that the serology evidence in his case was unreliable because , although there were witness statements indicating that there was blood was all over the floor and couch at the petitioner's house, such evidence was apparently not tested by the crime lab. The petitioner contends that, had this evidence

33

been tested, it would have demonstrated the presence of Bennett's blood, and shown that she was stabbed at the house, and would have "totally destroyed the State's theory of the entire case against him."  (ECF No. 24 at 42).

The petitioner further asserts that the State collected the shirt he was wearing that night, but "conveniently" failed to test it or produce it at trial.  Detective Jones testified that the shirt that was tested and introduced at trial as State's Exhibit 12C was not the shirt the petitioner was wearing that night and that such shirt "might be in the trunk of his cruiser." (ECF No. 25, Ex. 5 at 491).

Finally, the petitioner asserts that these facts, combined with the Stolorow/Linhart report's findings concerning 11 areas of misconduct in the testing and reporting of serology evidence in the eight cases reviewed by Stolorow and Linhart "establish clear and convincing evidence that 'but for' the constitutional violations he is challenging (presentation of false evidence), no reasonable juror would have found him guilty of the offense charged."  (ECF No. 24 at 43) (Emphasis in original).  The petitioner's Response concludes:

> In Petitioner's case, the totality of the "serology blood" issue, from the beginning of collection, the dragging of Petitioner to have his drawn, the mysterious disappearance of crucial, material blood evidence, which was personally witnessed by a Chief of Police, and if tested Petitioner avers would have totally crushed the State's theory of the case.   The total REPORT of the investigation by Stolorow, clearly evidence[s] that 'in all reasonable likelihood the jury's verdict would have been affected."

(ECF No. 24 at 45).

The respondent's Reply contends that, given the petitioner's own testimony, the serology evidence presented by Myers was non-probative.  (ECF No. 25 at 5).  Thus, the respondent asserts that "the discrepancies identified in the Stolorow/Linhart report do

34

not qualify as a 'factual predicate' consisting of 'newly discovered evidence' justifying a fresh tolling of the AEDPA's Statute of Limitations." (*Id.*) The respondent further contends that the SCAWV "did not deem the findings in the Stolorow/Linhart report to qualify as newly discovered evidence justifying a new trial." (*Id.* at 6-7).

The respondent's Reply further states:

> Moreover, as discussed in further detail below, the Petitioner's testimony at trial reveals that he was fully aware of the presence of the victims' blood on the various items of clothing, the leaves and the van, and he admitted to being present when the victims were stabbed and moving the bloody bodies to the location where they were ultimately dumped by the Petitioner. Therefore, serological discrepancies aside, the Petitioner was aware at trial that the victims' blood was present on the identified exhibits subject to serological testing.

(*Id.* at 7). The respondent further asserts that "there is no legitimate reason why the Petitioner did not know, or at least could not have known, that his blood type was A-prior to 1998, or prior to trial for that matter." (*Id.*) The respondent correctly suggests that the petitioner, via his defense counsel, could have moved for independent testing of both his blood and any other evidence that he wished to challenge.

On August 19, 2014, the petitioner moved for leave to file a Sur-Reply, which was granted by the undersigned. The Sur-Reply contends that the respondent "is attempting to downplay and disregard the importance of the totality of blood evidence" and contends that the respondent's Reply destroys the State's theory of the case that Bennett was not stabbed at the house. (ECF No. 26 at 7). His Sur-Reply further asserts:

> Petitioner was and is fully aware that there was a possibility of the victims' blood on various items of clothing, the leaves and van. Petitioner was/is also aware that "when there is a possibility of four (4) different persons being involved in some manner of altercation, there has to be more than cursory testing to find out what blood is where, and that all blood is tested." In this case, it was not.

(*Id.* at 8).  The petitioner contends that the statement in the respondent's Reply that the petitioner moved "the bloody bodies to the location where they were ultimately dumped" is a recognition that both Dillard and Bennett were stabbed at the residence, and destroys the State's theory of the case.  (*Id.*)  The petitioner's Sur-Reply further asserts:

> Respondent states that "the blood stains on Carl Finney's sweatpants tested positive as the blood of the victim, Artissa Bennett only." However, the State stated that the sweatpants were Petitioner's and that Petitioner was wearing them when the crime was committed.  Trooper Myers testified that he never received any pants or clothing from Detective Jones or anyone marked as Karl Finney's, just Petitioner's.

> Petitioner points out that "due to more than one person" allegedly stabbing a victim, it is materially crucial that all stains be tested, not just the "practice of testing one piece and pronouncing that all blood is the same as was performed in his case." This is not accepted scientific practice or procedure, but assistance to the State prosecution for a sure conviction.

(*Id.* at 9).  The petitioner further contends:

> Trooper Myers' serology testing was innately flawed, falsified and, had he tested and reported all of the blood that he found correctly, the State's theory of the case would have been destroyed.  In other words, there would have been no premeditation, deliberation, willful, malicious, kind of act, that is, the essential elements of First Degree Murder.  There was/is more than enough evidence to show that Trooper Myers and the State did not test, and/or hid testing from Petitioner concerning the blood in the house in order to bolster their case.

(*Id.* at 10).

The petitioner has attempted to broaden the scope of his false evidence claim by calling into question all of the serology testing in his case.  He asserts that "if one item is tested in error, then there is a valid major issue concerning everything tested."  (ECF No. 1 at 66).  He further asserts that "everything that was tested should be discarded."

36

(*Id.* at 67). First, the undersigned finds this argument to be wholly speculative, as the SCAWV did not declare that all evidence tested by or testified about by serologists other than Fred Zain is deemed to be false. While the *Zain III* decision provides an opportunity for the petitioner to have a thorough review in the state courts of the serology testing done in his case, it is not a finding that any false evidence was actually used at the petitioner's trial. In order to receive the benefit of running the statute of limitations under the limited exception found in section 2244(d)(1)(D), the petitioner has the burden of proving the factual predicate for his false evidence claim, and that the same could not have been discovered with due diligence. At this point, he has failed to do so.

The only definitively false evidence asserted to have been discovered by the petitioner since his trial is the fact that his own blood type was different than that presented by Myers in his report and suggested in his trial testimony. The petitioner characterizes Myers' testimony as having matched the blood evidence in the van with him when the testing probably supported a match with Dillard only.

However, the fact that the petitioner's blood type was wrong does not appear to be material, in light of the petitioner's admissions that he had the victims in his van and then transported and dumped their bodies on Tank Hill. There is no question as to whether the petitioner was present at either his residence or at Tank Hill.

Rather, the false evidence concerning the petitioner's blood type appears to be cumulative of other evidence, and it appears that this "new evidence" would only be material to an attempt to impeach or discredit Myers. It does not appear to be material to the dispositive issue in the petitioner's case, which is whether the petitioner stabbed

and killed Artissa Bennett. Moreover, the petitioner's blood type is evidence that the petitioner could have discovered prior to trial, and it not credible to contend that the petitioner could not have discovered the falsity of his blood type with due diligence. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the error in the presentation of the petitioner's ABO blood type by Trooper H.B. Myers cannot serve as a "factual predicate" to run the one-year statute of limitations from the discovery of such error on or about February 28, 1998 or from June 16, 2006, the date of the *Zain III* decision.

Moreover, even if all of the serology evidence were discarded, as suggested by the petitioner (and, as done in *Zain I*), there is still sufficient evidence upon which the jury could have found the petitioner's guilt beyond a reasonable doubt. There is no testimony or evidence, other than the petitioner's own testimony, that would plausibly reflect that Bennett was stabbed 50 times at the house. The petitioner admitted that he took the victims up on Tank Hill. His nephew testified that Bennett was alive and walking away from the van with the petitioner, and then he saw her coat fly up in the air and heard Bennett screaming. After the screaming stopped, the petitioner came back to the van alone. Additionally, the items of evidence found on Tank Hill contained a great deal of blood that was consistent with Bennett's blood. Based upon this evidence, a reasonable juror could find that the petitioner deliberately and premeditatedly killed Bennett on Tank Hill.

Furthermore, to the extent that the petitioner is asserting that the State failed to test evidence from his house that would demonstrate that Bennett was stabbed by Finney in the house, the petitioner received the serology report prior to his trial and had

the opportunity to conduct his own serology testing if he believed that anything in the report was inaccurate or incomplete, including determining his own blood type, and whether there was additional evidence which should have been tested.

Other than his immaterial blood type, at this point, the petitioner has not demonstrated that any other false evidence was used at his trial. Consequently, the undersigned proposes that the presiding District Judge **FIND** that the petitioner cannot establish that there is new and material false evidence that can serve as the factual predicate of a claim or claims that would enable the petitioner to run the statute of limitations under section 2244(d)(1)(D).

These circumstances are both insufficient to satisfy the criteria for the application of section 2244(d)(1)(D) and to establish the necessary extraordinary circumstances to justify equitable tolling of the statute of limitations. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner's section 2254 petition is untimely under 28 U.S.C. § 2244(d)(1), and that the petitioner has not demonstrated extraordinary circumstances that would warrant equitable tolling of the statute of limitations. Finally, because the petitioner's section 2254 petition is untimely, this court is barred from reviewing the petition and, therefore, there is no basis for the court to revive and review the petitioner's motions to excuse exhaustion.

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the respondent's Motion to Dismiss Petition as Untimely Filed (ECF No. 15) and **DISMISS** the petitioner's Petition for a Writ of

Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 1) with prejudice.[8]

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the district court and a waiver of appellate review by the circuit court of appeals.  *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on the opposing party and Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy of the same to Petitioner, and to transmit a copy to counsel of record.

March 2, 2015

Dwane L. Tinsley
United States Magistrate Judge

---

[8]   These rulings have no effect on the petitioner's ability to continue to pursue habeas corpus relief in the Circuit Court of Kanawha County.